IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| OCTAVIA ANDERSON, JACQUELINE WALKER | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| MIAMI-DADE COUNTY and RENE RODRIGUEZ, Director of the Miami-Dade Housing Agency | ) ) ) ) |
| Defendants. | ) ) ) |

**MAGISTRATE JUDGE TURNOFF**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

I. PRELIMINARY STATEMENT

1.      This action, on behalf of Ms. Octavia Anderson and Jacqueline Walker, residents of Scott

Homes Public Housing Project, challenges the actions of the defendants Miami-Dade County

and the director of its Housing Agency in removing plaintiff, Octavia Anderson, as president of

the Scott Homes Resident Council in violation of applicable federal law and solely because of

her vocal opposition to the defendants' plans to utilize a HOPE VI grant from the U. S.

Department of Housing and Urban Development (U.S. HUD) to demolish the Scott Homes

public housing project in north central Miami Dade County and to displace the almost eight

hundred families residing in the project.

2.      As the elected leader of the resident council Ms. Anderson has the right and obligation

under federal law to provide resident input and consultation with respect to the defendants

demolition, relocation and replacement housing plans and policies as well as extensive input into



the other aspects of the Housing Agency's operation and oversight of public housing.  For the

past year and a half Ms. Anderson, as President of the Scott Homes Resident Council, has led

the residents in attempting to modify the Housing Agency's HOPE VI demolition and relocation

plans and to ameliorate the harshest aspects of those plans.  In the course of that leadership, she

has argued continuously since the adoption of the demolition and relocation plan for

modifications so that the existing residents can benefit from the project. She has criticized the

current plans of the Housing Agency and complained publicly and in writing regarding the

conduct of the agency to the United States Department of Housing and Urban Development and

the Miami Dade County Commission.  Defendants' actions as alleged herein are designed solely

to silence Ms. Anderson and other resident and community opposition to defendants' demolition

and relocation plans and to deprive the residents who elected her of a voice.  In attempting to

silence Ms. Anderson by depriving her of her leadership position, defendants ignored their own

policies and procedures, their past practices, federal law and the wishes of the residents solely to

eliminate a vocal public spokesperson who disagree with their policies.

3.      Plaintiffs seek through this action declaratory and injunctive relief as to defendants and

their staff and employees to enjoin any action which fails to recognize Ms. Anderson as the duly

elected President of the Scott Homes Resident Council until the end of her three year term.

Specifically, plaintiffs request this Court to order defendants to publicly notify their staff and

other resident councils that they continue to recognize Ms. Anderson as President of the Scott

Homes Resident Council, to refrain from denying her access to facilities in the Scott Homes

Public Housing project for legitimate resident council business, including informing tenants of

the progress of the demolition and relocations plans and to further refrain from denying her

access to planning meetings otherwise open to members of the resident council, until the end of her regular three year term.

4.      Plaintiffs further seek a preliminary injunction to maintain the *status quo ante* by ordering defendants to restore recognition to Ms. Anderson as president of the Scott Homes Resident Council pending this Court's final determination on the merits.

## II. JURISDICTION

5.      This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the Constitution and laws of the United States. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

6.      The plaintiffs' claims for relief are predicated upon Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3617; 42 U.S.C. § 1983, 42 U.S.C. § 1988, 42 C.F.R. §964.1 through 964.150 and the First and Fourteenth Amendment to the United States Constitution.

7.      Plaintiffs seek preliminary and permanent injunctive relief pursuant to Rule 65, Federal Rules of Civil Procedure.

## III. PARTIES

### A. PLAINTIFFS

8.      Plaintiff, Octavia Anderson, is a tenant in the Scott Homes public housing project, a 756 unit public housing in the African American community of Liberty City in North Central Miami-Dade County. Ms. Anderson is the duly elected president of the Scott Homes Resident Council, elected in December 1999 and recognized by the defendants on March 9, 2000. (A copy of that

letter is attached hereto as Exhibit A.)

9.      Plaintiff, Jacqueline Walker, is a tenant at the Scott Homes public housing project who voted for plaintiff, Octavia Anderson, for president of the Scott Homes Resident Council at the regularly scheduled election in December 1999.

## B. DEFENDANTS

10.     MIAMI-DADE COUNTY  is a political subdivision of the State of Florida which owns and operates federally subsidized public housing projects including Scott Homes and Carver Homes.  The County  is a Public Housing Agency ("PHA") within the meaning of 42 U.S.C. § 1437 and administers the federally subsidized and assisted public  housing within its jurisdiction as authorized by the United States Housing Act and implementing federal regulations.  Miami-Dade Housing Agency is the department within Miami-Dade County directly responsible for the administration and operation of the County's  public housing, including the administration and operation of Scott Homes Public Housing project.

11.     RENE RODRIGUEZ is the Director of the  Miami-Dade Housing Agency.  He is charged with establishing and administering the policies of the Agency including those relating to the daily operation, administration and maintenance of all public housing including Scott Homes Resident Council.

12.     Defendants Miami-Dade County  and  Rene Rodriguez  are collectively referred to herein as the defendants.  At all times relevant to this Complaint each defendant was acting under color of state law.

## STATUTORY AND REGULATORY SCHEME

4

**Federally Subsidized Public Housing Projects**

13.      The United States Housing Act of 1937 authorizes the United States Department of

Housing and Urban Development to provide financial assistance to local public housing agencies

for the development and operation of low income housing projects, commonly called public

housing projects.   While the financial assistance is provided by the federal government, the

development, maintenance and management of the public housing projects is entrusted to local

public housing agencies, subject to a federal statutory and regulatory scheme.

14.      Miami Dade County Commission acts as the public housing agency in Miami Dade

County.  The administration of the public housing program in Miami Dade County is performed

by the Miami Dade Housing Agency.   In Fiscal Year 2000 the Miami Dade Housing Agency

administered over 10,000  units of public housing in both elderly and family public housing

projects.

**Public Housing Resident Councils**

15.      Federal law has long recognized a unique, vitally  important and powerful role for public

housing resident councils in the operation and management of public housing.   For example,

federal law requires that each public housing agency consult with their appropriate resident

council as part of  their  Five Year Planning process, 42 U.S.C. § 1437c-1, and obtain their

approval as part of any resident management program, 42 U.S.C. § 1437r (b)(1).   Federal law

provides that resident councils have separate, priority funding opportunities, such as technical

assistance  funds, 42 U.S.C. § 1437g(h)(1), home ownership opportunities training funds, 42

U.S.C. § 1437s, home ownership planning grants, 42 U.S.C. § 1437aaa-1, supportive services

grants, 42 U.S.C. § 1437z-6, and drug enforcement grants, 42 U.S.C. § 11903.    Federal law also provides resident councils with a right of first refusal with respect to public housing proposed for demolition, 42 U.S.C. § 1437p,  priority purchasing  powers and other special considerations  with respect to home ownership programs, 42 U.S.C. § 1437aaa-2 through 1437aaa-5; 42 U.S.C. § 12875; 42 U.S.C. § 12895.   Finally, and most importantly for the present case, as is set forth below,  resident councils have extensive participation, consultation and cooperation rights with respect to HOPE VI planning and implementation processes.

**(a)  Resident Council Elections**

16.      Due to the importance of resident councils in the operation of public housing, there is a comprehensive and exacting regulatory scheme to guarantee that resident councils are democratically elected and remain free to voice their opinion and to operate independently from the Housing Authority management.   Specifically, the applicable federal regulations provide detailed requirements as to who may be members:

> The voting membership must consist of heads of households (any age) and other residents at least 18 years of age or older and whose name appears on a lease for the unit in the public housing that the resident council represents.  24 C.F.R. § 964.115

as to the minimum standards for election, including the following:

> All voting members of the resident community must be given sufficient notice (at least thirty days) for nomination and election.  The notice should include a description of election procedures, eligibility requirements and dates of nominations and elections.  24 C.F.R. § 964.130

and as to the minimum standards for recalling elected resident council officials:

> Each resident council shall adopt and issue election and recall procedures in their bylaws. 24 C.F.R. § 964.130

> The written [election] procedures must provide for the recall of the resident board by the

voting membership.  These provisions shall allow for a petition or other expression of the voting membership's desire for a recall election, and set the number or percentage or voting members ("threshold") who must be in agreement in order to hold a recall election. This threshold shall not be less than 10 percent of the voting membership. 24 C.F.R. § 964.115 (b).

17.     The regulations further specifically provide that a resident council that does not comply with the above mentioned requirements can not receive "official recognition" from the HA [Housing Authority]/HUD" nor may it receive funds for its ongoing activities.  Housing Authorities, such as the defendants herein, are given the ultimate responsibility for overseeing conformance by the resident councils with these regulatory requirements.  24 C.F.R. § 964.130.

**The HOPE VI Grant Program**

18.     In October 1992, Congress created the Urban Revitalization Demonstration Program ("URD"), otherwise known as HOPE VI, which provides grants of up to $50 million "to carry out an urban revitalization demonstration program involving major reconstruction of severely distressed or obsolete public housing projects to be administered by public housing agencies..." Pub. L. 102-389, Title II, 106 Stat. 1579, reprinted at 42 U.S.C. § 1437l, note.  Generally, as a result of the HOPE VI Grants public housing is demolished and the public housing residents displaced  and a significantly decreased number of housing units are replaced, often with higher income requirements and other more restrictive standards.

19.     The HOPE VI Program was subsequently codified at 42 U.S.C. § 1437v.  Despite the fact that the program has funded the most widespread and significant destruction of public housing since the initiation of the public housing program, the statute provides  that a major purpose of the program is:

(1) improving the living environment for public housing residents of severely  distressed

public housing projects through the  demolition, rehabilitation, reconfiguration, or
replacement of obsolete public housing projects (or portions thereof);

20.     HUD has also issued interpretive policies requiring  public housing agencies that receive

HOPE VI funds to involve affected tenants, including specifically the  resident councils,  in the

redevelopment process.   HUD's FY 1998 HOPE VI Guidebook at 1.

21.     The HOPE VI Grant Agreement entered into between defendants and the U.S.

Department of Housing and Urban Development, reflecting the statutory requirement, also

mandates that there be significant resident input and involvement throughout the process.

Specifically, the Grant Agreement requires that the Housing Authority's involvement of affected

residents must include:

(a)     providing substantial opportunities for affected residents to provide input, advice,
counsel, recommendations, and opinions as the Grantee plans and carries out its
revitalization efforts;
(b)     providing reasonable resources, as approved by HUD, for technical assistance,
training, and capacity building to prepare affected residents to participate meaningfully in
the planning and implementation of the Grantee's revitalization efforts;
(c)     holding regular meetings with affected residents and their representatives on the
status of revitalization efforts and to obtain comments, opinions, advice, and
recommendations from affected residents, including
(i)     providing affected residents with reasonable, written notice of the time,
place, and agenda for each meeting;
(ii)     holding meetings in places that are accessible to persons with disabilities
and providing reasonable accommodations to ensure full participation of persons
with disabilities; and
(iii)     maintaining accurate records of the meetings and actions taken therein;

(d)     making documents such as the HOPE VI Application, Grant Agreement,
Developers Agreement, Revitalization Plan, Relocation Plan, Community and Supportive
Service Plan, and minutes of meetings with affected residents available on-site at the
management office; and
(e)     providing affected residents with access to a contact person who can answer their
questions about the Grantee's revitalization plans and activities and also insure that

8

affected residents receive accurate information in languages that they understand.

## IV. STATEMENT OF FACTS

**Scott Homes Public Housing Project**

22.     Scott Homes Public Housing Project is a 756  unit public housing project located in the Liberty City neighborhood of north central Miami Dade County.   The Scott Homes project was constructed in 1953 and has always housed an exclusively African American population. Currently all (99%) of  the residents are African American.

23.     The population of Scott homes is also very poor.   While the median income in Miami-Dade County is approximately $42.000, the average income of the resident households is $7.238. less than 17% of the area median.

24.     The population of Scott Homes and the neighboring Carver Homes (which will also be demolished as part of the HOPE VI project) consists of many large families.   Of the 3093 residents in the Scott/Carver Homes complex, almost 2.600 (84%) are children under the age of eighteen.   In order to accommodate these households  there are one hundred and twenty five units that are four bedrooms or larger in the Scott /Carver Homes project.   Given the current housing crisis in Miami Dade County, particularly for poor African American large families, these large-family public housing units represent an irreplaceable resource.

**Ms. Anderson's Election and Advocacy**

25.     Ms. Octavia Anderson was elected to a three year term as president of the Scott Homes Resident Council on December 2, 1999.  Plaintiff Jacqueline Walker was a tenant of Scott Homes in December 1999 and continues to be today.   She voted for Ms. Anderson in that

election because she believed that Ms. Anderson would provide the type of advocacy the residents needed to benefit from HOPE VI. After a dispute regarding the election was reviewed by the defendants, Ms. Anderson was recognized by defendants as the President of the Scott Homes Resident Council by a letter dated March 9, 2000. (Exhibit A)

26.     In 1996, 1997 and 1998, prior to Ms. Anderson's election, the defendants had applied for a HOPE VI Grant to dramatically restructure Scott Homes. None of those applications were funded by U.S. HUD. Again, on May 17, 1999 the defendants submitted the current HOPE VI application to U.S. HUD. In September 1999 the Secretary of HUD announced that the defendants were awarded a $35 million dollar HOPE VI grant. While there was significant dispute among the residents of Scott Homes regarding the benefits of a HOPE VI grant for the current residents, Ms. Anderson believed that the best results could be obtained by working with the defendants to create a positive outcome for the current residents.

27.     Immediately after her election, Ms. Anderson began an active campaign to keep the Scott Homes residents informed as to the HOPE VI process. As part of this process, on the first Tuesday of every month since her election (as well as on numerous other occasions) she has presided over a meeting of the resident council and the entire resident membership, held, pursuant to the Resident Council by-laws, in the community meeting room of the Scott Homes Public Housing Project.

28.     As Ms. Anderson began working with the defendants on the implementation of the HOPE VI demolition and rebuilding plans she became increasingly concerned that the plans, as written, would not benefit the current residents but rather would simply displace the current residents to make room for future tenants and home owners with higher incomes. She was particularly

10

concerned that the HOPE VI plans provided for the demolition of over 820 units of public

housing in Scott Homes and Carver Homes and replaced it with only 80 units of public housing,

135 units of "rent to own" public housing and an additional 247 units of home ownership

housing.

29.     Ms. Anderson began to raise concerns that, because of these plans, more than six hundred

of the eight hundred African American families displaced by the County's HOPE VI project

would be displaced from their long term homes and community and effectively barred from

returning.  Of the replacement housing to be built on the site only the eighty units of traditional

rental public housing would be available to the very low income African American families such

as currently reside at Scott Homes.   While the 135 units of "rent to own" housing could

theoretically be affordable to some of the current families who reside at Scott Homes, the

defendants have no existing  rent to own  housing program, nor have they developed any criteria

or program requirements for such a program.   The 247 home ownership units offer realistic

opportunities for very few of the current tenants.   The County's Plan states that the minimum

"qualifying income" for a one-bedroom home ownership dwelling is $12,126, fully two-thirds

more than the average annual income of a Scott Homes or Carver Homes family.

30.     Because of these concerns plaintiffs and other residents began to  request  that the

eligibility criteria and program requirements be developed prior to the relocation of the current

residents so that the current residents can participate in the development.   Defendants have

consistently declined to do so.

31.     Ms. Anderson also became increasingly concerned because the few replacement units

being constructed significantly excluded most of the larger African American families from returning to the site.   For example, of the fifty-two 5 and 6 bedroom units currently occupied on the site, only three 5 bedroom units will be replaced as either public housing or "rent to own" housing.

32.     Ms. Anderson began to voice concerns that the African American community currently residing Scott Homes would be forced to relocate to an already dwindling supply of other public housing developments or to private rental housing utilizing  Section 8 rental voucher subsidies. This will create significant hardships and potential homelessness for many of these individual households.

33.     The demolition of Scott Homes and Carver Homes  when combined with the other demolitions which Miami Dade County has proposed could reduce the number of family public housing units by one third.  Meanwhile the  demand for public housing continually increases. There are currently 6,443 families on the County's waiting list for public housing.   Over 95% of families on the County public housing waiting list are at or below 30% of the area median income.

34.     The only other relocation resource proposed for the residents, Section 8 program housing vouchers has extremely limited utility in Miami-Dade County because it depends upon the willingness of private landlords to accept the public housing residents as tenants and to accept the bureaucracy, regulations and rent restrictions of the Section 8 payment system.   As a result, most voucher holders who successfully locate a rental unit  end up living in poor, racially segregated neighborhoods.  The Miami metropolitan area was identified by U.S. HUD  in September 2000 as an area with severe geographic concentrations of Section 8 voucher families.

12

with at least 25% of voucher families residing in 5% of the area's census tracts.

35.     Despite the fact that Ms. Anderson has been the duly elected President of the Resident

Council since December 1999 and despite the express requirements of the HOPE VI statute and

guidelines, she has not been permitted to be involved fully in the development of the HOPE VI

Plan.   Indeed, as described above, despite repeated pleas of the plaintiffs and other residents,

many crucial elements of the Plan have yet to be developed.   Rather all of the defendants'

energies and meetings with the residents and the resident council have been focused on the

prompt relocation of the residents and the demolition of their homes.   The defendants have never

provided the residents with copies of the Grant documents or any of the post -grant agreements

or development documents.   Nor have the documents been made available for residents at the

site.   Residents, despite requests, have never been offered technical assistance to  aid them in the

provision of input.

36.     On January 30, 2001, plaintiff Octavia Anderson complained in writing to the United

States Department of Housing and Urban Development as well as local and federal elected

officials regarding the above mentioned concerns.  (A copy of the letter of complaint is attached

hereto as Exhibit B).  Specifically, she complained that the HOPE VI plan, as it was being

implemented, violated (1) the Fair Housing Act because it had a disparate impact on African

American families (2) the Housing and Community Development Act and (3) the obligation of

the defendants to work with the Resident Council leadership in implementing the HOPE VI

plan.

37.     From that date forward, defendants have initiated no meetings or dialogue  with Ms.

Anderson as the President of the Scott Homes Resident Council and have deliberately  excluded

13

her from any ongoing planning and implementation discussions and meetings. Meanwhile, defendants have continued planning efforts and continued meetings and discussions with residents who did not join with Ms. Anderson in complaining to the United States Department of Housing and Urban Development regarding the violation of the residents rights to fair housing. Moreover, defendants, both directly and together with the Overall Tenant Advisory Council, dramatically escalated their efforts to silence Ms. Anderson and began a systematic policy and program of retaliation designed to prevent her from continuing her complaints regarding the violation of the civil rights of the residents.

38.     On or about February 16, 2001 Ms. Anderson received a communication from her fellow resident council board members and was further informed by the president of the Overall Tenant Advisory Council (OTAC) that she had been removed as president. (A copy of that letter is attached hereto as Exhibit C.) She complained through her counsel to the defendants who, on March 15, 2001, responded to her and to the OTAC president that they were obligated to continue to recognize her as the appropriate procedures had not been followed. (A copy of that letter is attached hereto as Exhibit D.)

39.     However, on April 9, 2001 Ms. Anderson received another communication from OTAC president informing her that "a meeting had been held on Friday, March 9, 2001 at James E.Scott Resident Development and that a voting process had been held to vote you out of office" and that she was, once again, being removed as president of the Scott Homes Resident Council by OTAC. ( A copy of that letter is attached hereto as Exhibit E)

40.     At no time did plaintiffs receive any notice of the meeting of March 9, 2001 nor, to the best of their knowledge, did most of the other residents at Scott Homes Resident Council. Ms.

14

Anderson did not call a special meeting nor was March 9, 2001 the date of a regularly scheduled meeting.   At no time has Ms. Anderson or the other plaintiffs ever seen an agenda or any statement regarding the proposed content of the March 9, 2001 meeting.

41.     At no time was there any recall petition of any sort circulated and signed by the residents. To the extent that any process occurred at the meeting of March 9, 2001 it did not conform to the requirements of federal law or the rules and procedures of the resident council.

42.     Ms. Anderson, through her counsel, immediately complained again to the defendants and demanded that they continue to recognize her as the president of the Resident Council. (A copy of the letter is attached hereto as Exhibit F). On May 9, 2001, Ms. Anderson's counsel received a response from the defendants' counsel stating that they declined to exercise their authority to overturn the election. (A copy of the letter is attached hereto as Exhibit G.) In determining that they would refuse to supervise the electoral process and insure that it conformed to law, defendants deliberately treated Ms. Anderson differently than they had treated other resident leaders, solely because she was advocating for improvements in the HOPE VI plan and complaining regarding its fair housing impacts on the African American community both inside and outside the project.

43.     Meanwhile, Ms. Anderson continued to advocate on behalf of the residents. As a direct result of that advocacy, the Miami- Dade County Commission, on May 8, 2001, adopted a resolution increasing the number of units to be built for very low income residents on and around the HOPE VI site by 175 units.   However, when plaintiff attempted to inform her fellow residents of this additional housing, defendants, in refusing to recognize Ms. Anderson as President, have refused to provide Ms. Anderson with access to meeting rooms or other facilities

at Scott Homes Housing Project in order to meet with residents.

44.     At all times mentioned herein, defendants have acted to retaliate and punish plaintiff, Octavia Anderson, for voicing complaints regarding the violation of her rights and the rights of her fellow residents to  Fair Housing and to the protection of federal law.   In addition, defendants' actions have been directed to silence Ms. Anderson and to prevent or limit further advocacy.

45.     These actions have caused and will cause irreparable injury to the plaintiffs. Unless they are enjoined plaintiff Octavia Anderson will be deprived of her right to represent the residents with respect to their imminent dislocation as part of the HOPE VI program.   Plaintiff Jacqueline Walker will lose the elected president for whom she voted and whom she desires to have represent her until such time as her term expires or she is legally recalled.

CLAIMS FOR RELIEF

FIRST  CLAIM FOR RELIEF<br>Violation of the 42 C.F.R. §964.1 through 964.150 and 42 U.S.C. § 1983

46.     Plaintiffs repeat and reallege Paragraphs 1 through 45  as if set out in full.

47.     42 C.F.R. § 964.18(a)(1) provides that the Housing Authority "shall recognize a duly elected resident council..."  42 C.F.R. § 964.18(a)(7) provides that "In no event shall HUD or a Housing Authority recognize a competing resident council once a duly elected resident council has been established."

48.     42 C.F.R. § 964.115(b) provides that a resident council's election procedures must provide for recall elections which must be conducted by the voting membership of the resident project and that such elections can occur only after a circulation of a " "petition or other

16

expression of the voting membership's desire for a recall election" and that the recall petition must at a minimum contain no less than 10% of the voting membership.

49.     42 C.F.R. § 964.130(a)(5) provides that all voting members of the housing project must be given at least thirty days notice of any election, together with information regarding the election procedures.  42 C.F.R. § 964.130(a)(6) provides that it is the obligation of the Housing Authority to monitor the resident council elections.

50.     At no time did the recall of Ms. Anderson conform to any of these requirements.  There was no authorized meeting, no notice or agenda, no recall petition, no notice of a recall election and no recall election.  Despite Ms. Anderson's complaints and despite a legal obligation to do so, at no time did defendants undertake any investigation or inquiry to determine whether these regulations had in fact been conformed to.

SECOND CLAIM FOR RELIEF
Violation of the Fair Housing Act, Title VIII of the Civil Rights
Act of 1968, 42 U.S.C. § 3617

51.     Plaintiffs repeat and reallege Paragraphs 1 through 50 as if set out in full.

52.     42 U.S.C. § 3617 makes it "unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by [the Fair Housing Act.]."

53.     On or about January 30, 2001, Ms. Anderson and other African American residents at Scott Homes complained to U.S. HUD about violations of the Fair Housing Act in the defendants request for and administration of the HOPE VI Grant for the Scott Homes/Carver Homes Public Housing Project.

54.     Thereafter, because plaintiff Anderson was attempting to complain about violations of fair housing laws, as is alleged above, defendants have embarked on a campaign of intimidation, threats, and interference with the Plaintiff Anderson's exercise and enjoyment of her rights as conferred by the Federal Fair Housing Act.

55.     Defendants failure and refusal to continue to recognize Ms. Anderson is intentionally designed to deter and interfere with her ability to pursue her grievances and to advocate for changes in the HOPE VI project.

THIRD CLAIM FOR RELIEF
Violation of the First Amendment Right of Freedom Speech
42 U.S.C. § 1983

56.     Plaintiffs repeat and reallege Paragraphs 1 through 55 as if set out in full.

57.     The defendants' actions as described herein interfere with plaintiffs right of freedom of speech as secured through the First and Fourteenth Amendment to the United States Constitution.

REQUESTS FOR RELIEF

WHEREFORE, plaintiffs respectfully respect this Court:

1.     Issue a permanent injunction enjoining all defendants from taking any actions which fail to recognize Ms. Octavia Anderson as President of the Scott Homes Resident Council until such time as her three year term expires or she is legally recalled.  Further, said injunction should order defendants to refrain from interfering in any way with Ms. Anderson's rights as President of the Resident Council including but not limited to1) publicly notifying their staff and other resident councils that they continue to recognize Ms. Anderson as President of the Scott Homes

18

Resident Council, providing her access to facilities in the Scott Homes Public Housing project for legitimate resident council business, including informing tenants of the progress of the demolition and relocations plans and affording her access to planning meetings otherwise open to members of the resident council.

2.      Issue a preliminary injunction ordering defendants to restore the status quo ante by recognizing Ms. Octavia Anderson as President of the Scott Homes Resident Council pending this Court's final determination of the merits.

3.      Issue a declaratory judgment, pursuant to 28 U.S.C. §2201, declaring that in refusing to recognize Ms. Octavia Anderson as President of the Scott Homes Resident Council defendants have violated her rights and the rights of her fellow tenants, including Ms. Jacqueline Walker, as guaranteed under the Fair Housing Act, 42 U.S.C. § 3617; 42 U.S.C. § 1983, 42 C.F.R. §964.1 through 964.130 and the First and Fourteenth Amendment to the United States Constitution.

4.      Award costs of suit and reasonable attorneys' fees; and

5.      Grant other relief as this court may deem just and proper.

Dated:   5/29/2001

Respectfully submitted,
Attorneys for Plaintiffs

By _____
CHARLES F. ELSESSER, JR., ESQ.
Florida Bar No. 971162
FLORIDA LEGAL SERVICES, INC.
Miami Advocacy Office
3000 Biscayne Blvd., Suite 450
Miami, FL 33137
Telephone No. (305) 573-0092
Facsimile  No. (305) 576-9664

JONEL NEWMAN, ESQ.
Florida Bar No. 112320
Florida Justice Institute, Inc.
2870 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2309
(305) 358-2081
(305) 358-0910 - Fax





**DADE MDHA MIAMI HOUSING AGENCY**

CENTRAL OFFICE
1401 NW 7th Street
Miami, FL 33125
(305) 644-5100
Fax (305) 541-6716

APPLICANT & LEASING CENTER
2035 NW 18th Avenue
Miami, FL 33142
(305) 638-6464
Fax (305) 634-0428
TDD (305) 638-6014

2153 Coral Way
Miami, FL 33145
(305) 250-5232
TDD (305) 250-5256

5200 NW 22nd Avenue
Miami, FL 33142
(305) 638-6277
Fax (305) 636-1936

450 SW 5th Street
Miami, FL 33130
(305) 856-0357
Fax (305) 250-9124

25201 SW 139th Court
Naranja, FL 33032
(305) 267-0970
Fax (305) 257-1189

15201 SW 95th Avenue #300
Miami, FL 33157
(305) 256-4751
Fax (305) 254-3028

March 9, 2000

Ms. Octavia Anderson, President
Scott Homes Resident Council
2171 NW 74 Street
Miami, FL  33147

Re:  Confirmation of Resident Council

Dear Ms. Anderson:

Please accept my apology for the time consumed in settling the legitimacy of the Scott Resident Council's position.

After conferring with the County Attorney's Office, the Arbitrator and Miami-Dade Housing Agency's (MDHA) management staff, please be informed that the resident council elected on December 2, 1999 will remain as the Scott Home Resident Council's representatives. The acting executive board of the Overall Tenant Advisory Council (OTAC) also agrees in this decision and along with MDHA Resident and Economic Development staff take this opportunity to welcome you to perform and outstanding job, representing hundreds of families facing another step towards self-sufficiency.

On Thursday, March 9, 2000 the OTAC Executive Board Elections will be held in the MDHA's New Board Room, 1401 NW 7 Street at 6:00 p.m.   As President of this development you are encouraged to participate in this process.

The Resident Development staff and I look forward in working with you in accomplishing the goals that have been set for your development.  With each step achieved is another step towards independence, instead of dependency.

Sincerely,

Joan A. Tyler
Assistant Director
Resident and Economic Development Division

JAT'mag

cc: Scott Homes Management and Resident Services
    Scott Homes Resident Council
    OTAC Acting Executive Board
    Rene Rodriguez, Director
    Richard E. Miller, Deputy Director
    Arturo Tigera, Esq., Director Housing Development Division
    Tawana Thompson, Director DLAD
    Sandra Walker, Resident and Economic Development
    Mary Reesse
    Patricia Hill
    Ruby Burse





**FLORIDA LEGAL SERVICES, INC.**
**MIAMI ADVOCACY OFFICE**
3000 Biscayne Boulevard, Suite 450
Miami, Florida 33137
Telephone: 305-573-0092
Fax: 305-576-9664

VALORY GREENFIELD
MIRIAM HARMATZ
ARTHUR J. ROSENBERG
CHARLES F. ELSESSER
ATTORNEYS

January 30, 2001

KENT R. SPUHLER
DIRECTOR

Mr. Milan Ozdinec
Acting Deputy Assistant Secretary
Office of Public Housing Investments
U.S. Department of HUD
451 - 7th St., S.W.
Washington, DC 20024

Mr. Jose Cintron
U.S. Department of Housing and Urban Development
Florida State Office, Southeast/Caribbean
Brickell Plaza Federal Building
909 S.E. First Ave., Room 500
Miami, FL 33131-3028

Re:   James E. Scott Homes FY 1999 HOPE VI Revitalization Grant - Demand for
      Immediate Halt to Revitalization Activities

Dear Messrs. Ozdinec and Cintron:

We, the undersigned, are writing on behalf of the Scott Homes Resident Association, the resident council of the James E. Scott Homes public housing development (FL 005 004) in Miami, Florida. On behalf of the Resident Association, we demand that HUD require the Miami-Dade Housing Agency ("MDHA"), on pain of the termination of existing HUD funding, immediately to halt any further HOPE VI revitalization activities at that development, including particularly any relocation activities, until the serious concerns of the Resident Association have been satisfactorily resolved.

The basis for this urgent demand is that the actions of the MDHA: 1) violate the Fair Housing Act because they have a disparate adverse impact on both African Americans and families with children, 2) violate Section 104(d) of the Housing and Community Development Act because the MDHA will not replace the demolished low income housing on a one for one basis, and 3) despite repeated requests, MDHA has failed to address the Resident Association's serious and fundamental concerns about the goals and implementation of the HOPE VI project and has basically refused to work with the Resident Association in any meaningful or acceptable manner.

We further remind you that the Fair Housing Act, 42 U.S.C. §3608, and Executive Order 11063

 EXHIBIT B

require HUD to act affirmatively to further fair housing and to prevent discrimination. HUD violates its affirmative duty to further fair housing when it fails to consider the racial and socio-economic effects of its funding decisions and when it fails to force HUD funding recipients to comply with the Fair Housing Act. See Anderson v. City of Alpharetta, 737 F.2d 1530, 1537 (11th Cir.1984).

I.     VIOLATIONS OF THE FAIR HOUSING ACT.

The failure of the project to allow significant numbers of the residents to return and to guarantee even the most minimal community and supportive services violates HOPE VI requirements and has a significant unlawful adverse impact on African American families, particularly those families with children.

A. MDHA's HOPE VI Plans Will Have a Disparate Adverse Impact on African American Families.

The Scott Homes Project currently provides housing for 733 families (the neighboring Carver Homes project which is also part of this HOPE VI Project provides an additional 93 units of housing). The families living in Scott and Carver Homes are overwhelmingly African American and receive affordable housing in an increasingly tight housing market. MDHA's current plans for replacement housing provide for only 86 public housing units that will be generally available to current residents[1] and 135 units which are described as "rent to own" and for which the qualifying criteria are nowhere described.

Thus, at least six hundred families, 98.9 percent of whom are African American, will be forced from their homes.[2]  However, only 65 percent of families in public housing administered by MDHA are headed by African Americans and, according to 1990 Census figures, only 20.5 percent of Miami-Dade County's total population is African American. MDHA's wholesale displacement of Scott and Carver Homes families will therefore have a disparate adverse impact

_____

[1]          Indeed, it is not even clear what the criteria for occupancy of these units will be. At various times the Housing Agency has said that they would require some type of "Family Self Sufficiency" requirement. However, when the residents raised questions such as what would occur at the end of the initial five year Self Sufficiency period or to what extent the disabled, the elderly and others on fixed low incomes could participate, it became clear that no clear criteria have been established to determine who would receive this housing, much less the eligibility requirements which would be imposed.

[2]          The residents recognize that there are an additional 156 home ownership units provided in the HOPE VI project. However, they also recognize that the economics of home ownership are such as to exclude many, if not most, of those who wish to return.

on African American families in violation of the Fair Housing Act, 42 U.S.C. § 3604. See
Jackson v. Alkalize County, 21 F.3d 1531, 1543 (11th Cir. 1994).

The discriminatory impact of MDHA's actions are exacerbated by the dire circumstances faced
by African American families in Miami-Dade County. The most recent Miami-Dade County
Consolidated Plan (the "ConPlan") confirms the increasing poverty of African American
community. While African Americans comprise approximately 22% of the overall population,
they are almost 30% of the very low income households. Additionally, census data documents
that the median income of African American families is 30% less than that of all families; that
they are much more likely to be renters and significantly more likely to be in poverty.

## B. MDHA's HOPE VI Plans Will Have a Disparate Adverse Impact on Families with Children.

Not only is the absolute number of families who can return to Scott Homes dramatically limited,
large families are excluded to an even greater degree. There are currently 124 units with four or
more bedrooms in Scott and Carver Homes. Fifty-two of these are five or six bedrooms. After the
project is redeveloped, there will be only 34 four-bedroom units, 6 five-bedroom units, and no
six-bedroom units. Of the 6 five-bedroom units, only 1 will be public housing or "rent-to-own"
housing. This represents a 68 percent reduction in the number of units available to large families.

Scott and Carver Homes families desperately need the multi-bedroom units provided in these
developments. The Miami-Dade County ConPlan identifies large, very low income families as
the most needy of all the disadvantaged -- with almost 70% paying more than 50% of their
income in rent. The ConPlan, at page II-4, documents the lack of affordable housing for larger
families will only get worse as the percentage of dwelling units with three or more bedrooms
decreases. Moreover, the ConPlan ranks the needs of these families as the "highest priority". Id.
at p. III-4.

The large families currently living in Scott and Carver Homes will be widely excluded from
replacement housing opportunities at a time when the housing needs of large families are the
greatest. The Resident Association has complained about this from the very beginning. They
have been told that everything is open to review. However, nothing has been reviewed or
modified in any way. Rather, the project moves inexorably towards relocation and demolition.
When the ultimate effect of a defendant's action is to exclude on the basis of a protected
classification in the face of great housing needs, this action has a discriminatory effect. See U.S.
v. City of Black Jack, Mo., 508 F.2d 1179, 1186 (8th Cir. 1975).

## C. MDHA's Choice of Scott Homes for its HOPE VI Application Was Based On Improper Consideration of the Race of the Residents.

In its HOPE VI application, MDHA included a copy of fact sheet, entitled 1999 HOPE 6: What

3

are the characteristics of a winning application." See HOPE VI Application, Att. 6). This fact sheet is a bullet point summary of the "basic concepts of HOPE VI" MDHA believes "must be adhered to in order to be able to have a successful application" Id. Halfway through the nine-item list, the housing authority includes "discouraging concentrations of minorities in undesirable neighborhoods" as one of the essential ingredients of a winning application. Id.

A goal of "discouraging concentrations of minorities," from any neighborhood ..., is a racial motive. MDHA's scheme to displace Scott Homes families, nearly all of whom are African American, and to permit only a small fraction any chance of returning, is racially motivated. MDHA has singled out a community for involuntary displacement on the basis of the racial background of members of this community. The housing authority's actions violate the Fair Housing Act, 42 U.S.C. §3604, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, et seq., and the Fourteenth Amendment of the U.S. Constitution.

It is irrelevant, both to the unlawfulness of its actions and to HUD's duty to force grantees to comply with the Fair Housing Act, that MDHA may have had a fair housing objective in pursuing its scheme to discourage concentrations of African Americans in Scott Homes. Purposeful exclusion of persons from housing on the basis of race is unlawful regardless of any fair housing benefits a defendant believes will accrue from this exclusion. See U.S. v. Starrett City Assocs., 840 F.2d 1096 (2nd Cir. 1988).

## D.  Those Replacement Housing Options that MDHA Has Proposed Will Cause Further Harm to Scott Homes Families, and Will Perpetuate Segregation in Miami-Dade County

The only off-site relocation resources being offered are Section 8 vouchers, other public housing units, or home ownership units. None of these will provide effective, affordable housing choices for the majority of the Scott Homes families unable to return to the revitalized site.

Section 8 Vouchers -- The tight housing market in Miami-Dade County makes tenant-based Section 8 vouchers extremely difficult to use, particularly for larger families. HUD has recently identified Miami as a metropolitan area with severe voucher utilization problems, with a high level of geographic concentration of voucher households. See HUD No. 00-223 (Sept. 12, 2000). Moreover, many large families in Scott Homes fear that they will have no choice but to use their vouchers to relocate to neighborhoods in South Miami-Dade County, a racially-concentrated area far distant from the Scott Homes neighborhood and the neighborhood's jobs and schools. For families needing four, five and six-bedroom units, vouchers are virtually

---

[a]        In point of fact, according to a market analysis commissioned by MDHA, Liberty City, where Scott Homes is located, is a decidedly desirable neighborhood. Goodkin Consulting concluded that the MDHA's redevelopment plan will "be a highly successful project from a sales standpoint." Letter, Jack Winton, Goodkin Consulting, to Rene Rodriquez, MDHA (May 20, 1999).

4

Messrs Ozdinec and Cintron
January 30, 2001

useless. For example, in the entire county, only 1 percent of the 15,000 Section 8 vouchers MDHA currently administers are being used to rent five-bedroom dwelling units.[4] Home Ownership -- The County has also made much of its intensive effort to provide home ownership to as many residents as possible. However, again, this option will be extremely difficult for the current residents to utilize. First, regardless of the affordability options offered home ownership will not be affordable to most of the current residents. MDHA's HOPE VI application states that the County has the ability to provide a heavily subsidized home ownership opportunity to a family needing a three bedroom unit with an income as low as $19,395. See Att. 26i. While this is admirable, it does not serve the needs of the current residents. The average current income of families in the project is $7,238. Thus this option while enormously desirable and touted constantly by the Housing Authority is in reality a false hope for virtually all of the current residents. Moreover, there simply will not be home ownership units built for the larger families - with only 26 four-bedroom units and 4 five-bedroom units.

Public Housing -- Thus, the only realistic alternative for many Scott Homes families -- particularly large families -- will be to move to another public housing project which will displace them from their current homes, exclude them from the opportunities offered at the revitalized site and leave them no better off than before the revitalization.

## II.    VIOLATION OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT.

The failure of the MDHA to replace the demolished low income housing on a one for one basis violates Section 104(d) of the Housing and Community Development Act. That section provides that when a project utilizing Community Development Block Grant funds results in the loss of low and moderate income housing, the County must "provide within the same community comparable replacement dwellings for the same number of occupants as could have been housed in the occupied and vacant occupiable low and moderate income dwelling units demolished or converted to a use other than for housing low and moderate income persons." " There is no question that this project relies heavily on Community Development Block Grant expenditures. The HUD and County Commission approved budget contains $2,000,000 in CDBG funds. There is also no question that the units being demolished are not being fully replaced and, particularly, are not being replaced with comparable housing for the types of families that currently reside there.

## III.   VIOLATION OF HOPE VI STATUTE AND IMPLEMENTING REGULATIONS

---

Nor will it help that these families are promised "intensive relocation assistance" to insure that they locate an adequate unit. Even if such assistance initially locates an adequate relocation unit for the family, the family's relocation problem is simply delayed a year or two until the time when that landlord asks the family to leave and there is no longer any "intensive relocation assistance" available. At that point the family will simply lose the voucher after the 120 day search period expires.

January 30, 2001

AND GUIDANCE/FAILURE TO CONSULT WITH RESIDENTS.

Following the initial award, the Scott Homes Resident Association was enthusiastic about the revitalization of their home and the opportunities for their families the HOPE VI program promises. Indeed, the Resident Association has worked hard to attempt to fashion a plan that meets the needs of the residents. However, despite repeated requests, MDHA has failed to address the Resident Association's serious and fundamental concerns about the goals and implementation of the HOPE VI project. Instead, MDHA relocation activities have moved inexorably ahead and residents have been left only with empty promises: that their concerns will be addressed some day in the future -- after many of the residents have been forced to relocate throughout the county and their current homes have been demolished.

The Resident Association has expressed their concerns in writing on numerous occasions to the Housing Agency, local and federal elected officials. I have attached some of this correspondence to demonstrate that the Resident Association's concerns have remained constant, consistent from the beginning of the project. These concerns continue to the present day.

A.  **The Scott Homes HOPE VI Project Will Displace Residents Before Replacement Housing Is in Place.**

The 1999 Notice of Funding Availability for HOPE VI provides that the purpose of the HOPE VI grant is to "...improve the living environment for public housing residents of severely distressed public housing projects through the demolition, substantial rehabilitation, reconfiguration and/or replacement of severely distressed units." In addition, a significant factor in the evaluation of HOPE VI applications is the extent to which that purpose is accomplished through plans developed with ongoing resident input.

In the present case, despite the fact that home ownership is a significant component of the plan and despite the imminent relocation of up to one-fourth of the residents, the Housing Authority has not yet begun to develop the programmatic design of the replacement home ownership programs. Indeed, in its initial Public Housing Plan the local Housing Authority indicated that the only Home ownership Program administered by the Agency was a 1977-78 Turnkey III project and additionally that the Agency had no "Rent to Own" or Section 8 Home ownership program.

The failure of the Agency to allow the residents to participate in the development of these replacement housing programs prior to their relocation is a direct violation of the HOPE VI funding criteria. Moreover, in the present case, a substantial number of the residents will be dislocated before the Housing Agency even begins to address the development of the replacement housing programs. We fear that MDHA's real purpose with respect to Scott Homes families is simply to disperse them, with little regard to what happens to them after that.

6

**B. The Scott Homes HOPE VI Project Will Displace Residents Before Even the Most Rudimentary Community and Supportive Services Are in Place.**

The HUD Guidance on Community and Supportive Services for Original Residents states:

> HOPE VI may ultimately be judged more by its effectiveness in helping low-income families improve the quality of their lives and move toward self-sufficiency than by the physical improvements it creates. The program must offer appropriate services toward these ends to all families who reside in a development when the HOPE VI process begins...

To this date, despite repeated pleas from the residents, and only a few months before planned relocation, there has been no community and supportive services plan developed, much less implemented, for the current residents. In response to these pleas, the housing authority, and its consultants, have simply stated that the plan will be developed later -- after relocation is well under way.

The Community and Supportive Services Plan should have been implemented as soon as the grant was awarded. It will be impossible for the residents to provide input into the development of a Community and Supportive Services Plan after they have been relocated throughout the County. Indeed, many of the residents may need significant services prior to, or contemporaneous with, their relocation.

Residents must have the opportunity to provide meaningful input into the development of an effective Community and Supportive Services Plan. Services must be in place well before relocation can occur.

## CONCLUSION - REQUEST FOR IMMEDIATE INTERVENTION AND ASSISTANCE

MDHA's project is an unlawful scheme to disperse Scott Homes families wholesale on the basis of their race. The housing authority's actions threaten to disparately impact African Americans in MDHA public housing and families with children. For the reasons above, we demand that HUD force the Miami-Dade Housing Authority to bring its HOPE VI project into compliance with the Fair Housing Act if necessary by terminating HUD funding to the housing authority.

Specifically, in order to discharge its affirmative fair housing duties, HUD must:

1. require MDHA to increase the number of units available to the current residents on the current site so that all residents who wish to return to the revitalized site may do so;

2. require MDHA to formulate replacement housing programs that involve no net loss in the number of public housing rental units, with input from residents and their advocates, prior to the

January 30, 2001

commencement of any relocation activities; and

3. also prior to the commencement of any relocation activities, require MDHA to formulate a Community and Supportive Services Program, with input from residents and their advocates.

None of this can occur in the context of MDHA's current timetable. We therefore demand that HUD force MDHA to halt all relocation activities until these issues are resolved in a manner that addresses the needs of Scott Homes residents and the civil rights obligations of MDHA and HUD.

Thank you very much for your attention. Given the seriousness of this situation, we ask that you make your reply within fifteen days. If we do not hear from you within this time, we will assume that you are proceeding without any modifications to the present project and we will advise our clients accordingly.

Finally, in making your reply it would be helpful to us if you would describe the steps HUD undertook pursuant to 42 U.S.C. 3608 and E.O. 11063 to determine the racial and socio-economic effects of MDHA's HOPE VI proposal before proceeding with its decision to provide funding to the housing authority. We note that HUD's February 26, 1999 SuperNOFA announcing the availability of FY 1999 HOPE VI funding includes no discussion of the fair housing analysis HUD performs prior to awarding HOPE VI grants.

Sincerely,

/s/

Charles F. Elsesser, Jr., Esq.
Florida Legal Services, Inc.

/s/

Barbara Lanshe, Esq.
Michael Birnholtz, Esq.
Legal Services of Greater Miami, Inc.
3000 Biscayne Blvd., Suite 500
Miami, Florida 33137

/s/

JoNel Newman, Esq.
Florida Justice Institute, Inc.
2870 First Union Financial Center
200 South Biscayne Boulevard

8

Stress and Center
January 30, 2001

Miami, Florida 33131-2309

/S/

Todd Espinosa, Esq.
National Housing Law Project
614 Grand Ave., Ste. 320
Oakland, CA 94610

cc:     Mr. Rene Rodriguez
        County Commissioners
        Mr. Steve Shiver, County Manager
        Mr. Terrence Smith, Esq., Office of the County Attorney

9



February 14, 2001

Octavia Anderson
2171 NW 68th Terrace
Miami, FL 33147

Dear Octavia Anderson,

As a result of the meeting held on February 13, 2001, at the James E. Scott Community Center at 6:00 P.M. with the Resident Council Board Members of the James E. Scott Homes Development, there was a unanimous vote to remove you as President of the Resident Council Board of James E. Scott Homes.

The Resident Council Board voted to remove you due to breaking The Code of Ethics under Section 1 for disruptive and negative behavior, which resulted in removal effective February 14, 2001.

The Resident Council feels that you have not represented the Residents with a positive intent.

The Resident Council would like to thank you for your time and effort that was given on the Resident Council Board of James E. Scott Homes.

See attachments.

Sincerely;

_Charlotte Livingston_
Charlotte Livingston, Recording Secretary

_Sarah Haber Sham C. R_
Sarah Habersham, Corresponding Secretary

_Rosalind Dingle_
Rosalind Dingle, Treasurer


cc:   Rene Rodriguez, Executive Director MDHA
      Rudy Perez, Director Public Housing
      Auturo Tigera, Director HOPE VI
      Joan Tyler, Director Resident Services
      Yvonne Green, President OTAC
      Tracy Scott, Site Manager Scott Homes

EXHIBIT C

EXHIBIT D



March 15, 2001

Mr. Charles Elsesser, Esquire
Florida Legal Services, Incorporated
Miami Advocacy Office
3000 Biscayne Boulevard
Suite 450
Miami, Florida 33137

Dear Mr. Elsesser:

This is in response to your letter dated February 26, 2001, concerning the Scott Homes Resident Council (SHRC) officers' decision on February 14, 2001, to remove Ms. Octavia Anderson as President of their council. The Miami-Dade Housing Agency has reviewed this matter and determined that it will continue to recognize Ms. Anderson as President of that council. Accordingly, we have sent the enclosed letter to the SHRC officers and to the President of the Overall Tenant Advisory Council (OTAC).

Thank you for bringing this matter to our attention.

Sincerely,

Rene Rodriguez
Director

Enclosure

OFFICE OF THE DIRECTOR
1401 NW 7th Street
Miami, FL 33125
(305) 644-5100
Fax (305) 541-5716

www.co.miami-dade.fl.us/housing



EXHIBIT _D_



March 15, 2001

Ms. Yvonne Green, President
Overall Tenant Advisory Council
1407 N.W. 7 Street
Miami, Florida 33125

Dear Ms. Green:

Please be advised that pursuant to the federal regulations, Miami-Dade
Housing Agency (MDHA) is required to recognize Scott Homes Resident
Council (SHRC) and its duly appointed officers as the sole representatives of
the residents of Scott Homes. Pursuant to SHRC's by-laws, only the members
of the Association present at the meeting may remove officers. MDHA has
determined that the members of the Association were not given the
opportunity on February 14, 2001, to vote on whether Ms. Anderson should
be removed from her office. Accordingly, until such time as Ms. Anderson
has been duly removed or a new president is elected pursuant to the federal
regulations and SHRC's By-laws, MDHA will continue to recognize Ms.
Anderson as the President of Scott Home Resident Council.

Please govern yourself accordingly.

Sincerely,

Rene Rodriguez
Director

OFFICE OF THE DIRECTOR
1401 NW 7th Street
Miami, FL 33125
(305) 644-5100
Fax (305) 541-6716

www.co.miami-dade.fl.us/housing





**Yvonne Green, President**

OVERALL TENANT ADVISORY COUNCIL * 1407 NW 7TH ST., MIAMI, FL 33125 *305 541-2273 / 305 541-9593 fax * otacmia@bellsouth.net

April 9, 2001

Ms. Octavia Anderson
2171 N.W. 68th Terrace
Miami, FL 33147

Dear Ms. Anderson:

As you know there was a meeting held at James E. Scott Resident Development on March 9th, 2001, and a voting process took place to vote you out of office as President of the James E. Scott Resident Association by the residents of James E. Scott Development.

This is to advise you that the Overall Tenant Advisory Council (OTAC) no longer acknowledges you as President of James E. Scott Resident Association. OTAC and the residents of James E. Scott Development would like to extend their thanks and appreciation for the time that you have served as the President of James E Scott Association and wish you all the best in your endeavours in the future.

Respectfully,

Yvonne Green, President of OTAC

cc: Rene Rodriguez, Executive Director MDHA
Alphonso Brewster, Deputy Director MDHA
Rudy Perez, Director of Housing Operations
Arturo Tigera, HOPE VI Director
Joan Tyler, Director of Resident Services
Tracy Scott, Site Manager
Scott Homes Resident Council Members

EXHIBIT E

# FLORIDA LEGAL SERVICES, INC.
## MIAMI ADVOCACY OFFICE
3000 Biscayne Boulevard, Suite 450
Miami, Florida 33137
Telephone: 305-573-0092
Fax: 305-576-9664

VALORY GREENFIELD
MIRIAM HARMATZ
ARTHUR J. ROSENBERG
CHARLES F. ELSESSER
ATTORNEYS

April 26, 2001

KENT R. SPUHLER
DIRECTOR

Copy Delivered By Facsimile Mail (305) 541-6716)
Mr. Rene Rodriguez, Director
Miami Dade Housing Agency
1401 N.W. 7th St.
Miami, FL 33125

Re:     Scott Homes Resident Council

Dear Mr. Rodriguez:

Thank you for meeting with Ms. Newman, Ms. Anderson and me on Monday regarding the above mentioned project. I look forward to working with the newly assigned staff. In light of that meeting I was extremely concerned to learn from Ms. Anderson that, once again, the Overall Tenant Advisory Council has informed her that she has been removed as President of the Scott Homes Resident Council. Again, as was the case before, this action was in violation of both the organizational by-laws and federal law. I must therefore request that you immediately clarify that your agency will continue to recognize Ms. Anderson as President. In addition, I must reiterate that this interference with the regularly elected representatives of the residents is based solely on Ms. Greene's political disagreement with Ms. Anderson. Not only can such a disagreement not form the basis for any OTAC action, it is the deeply disruptive to the HOPE VI process.

There is no essential difference between this purported "removal" and the prior "removal". This removal, similar to the prior removal, occurred after a Ms. Greene held a session with a few Scott residents. That meeting was not a regular resident council meeting nor was it an appropriately called special meeting. Indeed, Ms. Anderson received no notice of the meeting nor did other members of the resident council. Ms. Greene simply leafleted a few blocks of the project and then spoke to the few residents who appeared. Ms. Anderson, as well as numerous other witnesses at the session, recall that no one was permitted to speak and that Ms. Anderson was not permitted to participate in any way. There was no prior notice of any election nor, according to witnesses, did any election take place. Certain participants were simply asked to sign a document which the OTAC leadership refused to show to Ms. Anderson.

As before, I have attached a copy of the Association's By-laws to this letter. Those By-laws clearly state in Article 8, Section (B) that officers of the Board can only be removed by a majority vote of the Association members and for just cause. Article 4 defines Association members as all members of the Housing Project over the age of 18 years. Thus, an officer can only be removed by Association members at a appropriately called membership meeting. There was *no* appropriately called membership meeting and thus there could be *no* appropriate removal under the By-laws.

Moreover, as with the last attempt, even if the above mentioned procedures had been followed the


EXHIBIT F

Mr. Rene Rodriguez
April 26, 2001
Page Two

"removal" would still be  illegal in that it violated applicable federal regulations.  24 C.F.R. § 964.115 provides the minimum standards for a  recall election with respect to Resident Councils.  It states that "recall" can only be accomplished by the voting membership.  Moreover, it states:

> These [recall] provisions shall allow for a petition or other expression of the voting membership's desire for a recall election, and set the number or percentage of voting membership ("threshold") who must be in agreement in order to hold a recall election.  This threshold shall not be less than 10 percent of the voting membership...

These provisions were created precisely to prevent what appears to have occurred here, i.e., Ms. Anderson was removed by a faction of the Board simply because she differed with them over what was best for the residents.

    Finally, even if a petition with 10% of the membership of Scott Homes had been gathered, Ms. Anderson would still be entitled to information regarding the charges against her and an opportunity to defend herself.

    As is clear from the foregoing, this  so-called "removal" of Ms. Anderson, once again,  did not conform in any way with the legally required procedures.  Your agency, pursuant to 24 C.F.R. § 964.130, has an obligation to insure that these procedures have been complied with and in addition, pursuant to 24 C.F.R. § 964.18 has an obligation to recognize a duly elected resident council.

    I realize that you understand the seriousness and immediacy of this request as you have previously acted with respect to the identical request and also, it is my understanding,  recently reinstated another resident leader for similar reasons.  I must therefore demand, once again, that you immediately clarify that your Agency will continue to recognize Ms. Anderson as the President of the Scott Homes Resident Council.   Withdrawal of recognition of Ms. Anderson as the President could subject your Agency to liability.  See Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Housing Authority, 979 F. Supp. 409 (E.D. Va. 1997), aff'd 1998 U.S. App. LEXIS 16749 (4th Cir. 1998)  Please let me know  your position no later than May 1, 2001.

    Thank you for your attention.

Sincerely,

Charles F. Elsesser, Jr.
Attorney at Law

cc: Mr. Terrance Smith



**COUNTY ATTORNEY**
**MIAMI-DADE COUNTY, FLORIDA**

111 N.W. 1 ST., SUITE 2810
MIAMI, FLORIDA 33128-1993
TEL. (305) 375-5151
FAX (305) 375-5634

May 9, 2001

**Sent Via Facsimile and U.S. Mail**
Mr. Charles Elsesser, Esq.
Florida Legal Services, Inc.
Miami Advocacy Office
3000 Biscayne Blvd, Suite 450
Miami, Florida 33137

**Re:**      **Octavia Anderson**

Dear Mr. Elsesser:

This will confirm my receipt of your letters, dated April 26, 2001 and May 4, 2001, to
Rene Rodriguez and myself, respectively.  In both letters, you demand that Miami-
Dade Housing Agency (MDHA) officially recognize Ms. Anderson as the current
president of Scott Homes Resident Council (SHRC) because you allege that the
Overall Tenant Advisory Council (OTAC) unlawfully removed her from said council.

I fully understand that in the past MDHA has issued written statements concerning
the attempt by OTAC to remove certain resident council presidents.  However, please
be advised that in no way do the federal regulations require MDHA to issue such
statements.   Instead, MDHA is required to "officially recognize a duly elected
resident council as the sole representative of the residents it purports to represent, and
support its tenant participation activities", but only as long as that resident council
continues to meet each of the criteria set forth in C.F.R. § 964.115.  See also, 24
C.F.R. § 964.18.  These regulations do not require MDHA to interfere in the election
process or removal of officers.  The federal regulations only mandate that USHUD,
not MDHA, can require MDHA to "withdraw its recognition of the resident council
and to withhold resident services funds as well as funds provided in conjunction with
services rendered for resident participation in public housing," where it is determined
that "a resident council fails to satisfy HUD minimum standards for fair and frequent
elections, or fails to follow its own election procedures as adopted."    24 C.F.R.
§964.130.

EXHIBIT G

Charles Elsesser, Jr., Esq.

Page 2

_____ /

In the case of Ms. Anderson, there has been much discrepancy concerning whether the second meeting held to remove her as president was proper. The MDHA has not received official word from USHUD concerning whether the resident council has violated USHUD's minimum standards or council's adopted procedures, nor has USHUD mandated that MDHA withdraw its recognition of the current resident council. Therefore, MDHA will continue to recognize the resident council of Scott Homes as the sole representatives of the residents. However, in saying this, MDHA will not take a stance with regard to Ms. Anderson's presidency. This is not one of its federally mandated duties or obligations.

The issues you raise in your letters are clearly not with MDHA, which continue to desire to work closely with each of the resident councils. Instead, it appears that your chief concerns are with Yvonne Greene and OTAC, and perhaps even with the remaining officers of SHRC who seek to remove Ms. Anderson. MDHA will not intervene in this dispute. As such, it is our recommendation that you address these concerns directly with the legal counsel representing OTAC and SHRC. It is our understanding that the latter terminated your assistance and has possibly retained the services of other legal counsel.

We are hopefully that this letter addresses the concerns of your client and we remain hopefully that you will continue to want to work closely with us as we move forward with HOPE VI. Please feel free to call me should you have any questions.

Sincerely,

TERRENCE A. SMITH
Assistant County Attorney

c.  Rene Rodriguez, MDHA Director
    Al Brewster, MDHA Deputy Director
    Raul Fernandez, Director, Housing Development Division
    Valeria Bland-Thomas, Esq., Legal Liaison
    Barbara Jordan, Senior Assistant County Manager
    Sammie Walthour, Junior Assistant County Manager
    Sharon Swain, Esq., USHUD Chief General Counsel
    Karen Cato-Turner, USHUD Public Housing Agency

**CIVIL COVER SHEET**

**CIV-GRAHAM**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

OCTAVIA ANDERSON, JACQUELINE WALKER

**DEFENDANTS**

MIAMI-DADE COUNTY and RENE RODRIGUEZ, Director of the Miami-Dade Housing Agency

MAGISTRATE JUDGE
TURNOFF

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE. IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Dade 01CV2189/DLG/TURNOFF

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Florida Legal Services
3000 Biscayne Blvd. Suite 450
Miami FL 3337    (305)573-0092

ATTORNEYS (IF KNOWN)
County Counsel, Miami-Dade County

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

IVa. ___2___ days estimated (for both sides) to try entire case.

**V. NATURE OF SUIT** (PLACE AN x IN ONE BOX ONLY)

| A CONTRACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | B SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | PERSONAL PROPERTY | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | ☐ 370 Other Fraud | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| A REAL PROPERTY | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | A FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 385 Property Damage Product Liability | ☐ 791 Empl Ret Inc Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | CIVIL RIGHTS | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 441 Voting | B PRISONER PETITIONS | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence Habeas Corpus | | |
| ☐ 290 All Other Real Property | ☒ 443 Housing/Accommodations | ☐ 530 General | | |
| | ☐ 444 Welfare | ☐ 535 Death Penalty | | |
| | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | |
| | | ☐ 550 Civil Rights | | |

**VI. ORIGIN** (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P 23
DEMAND $ Injunctive Relief
Check YES only if demanded in complaint
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)
JUDGE _____   DOCKET NUMBER _____

DATE  5/29/2001

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

FOR OFFICE USE ONLY: Receipt No. _____   Amount _____